IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of | No. 81287-4-I (consolidated with No. 81288-2-I) |
| V.D.-F. (DOB: 11/08/2011), | |
| M.D. (DOB: 03/05/2008), | DIVISION ONE |
|         Minor children. | UNPUBLISHED OPINION |
| JESUS ENRIQUE DIAZ ARDON, | |
|         Appellant, | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF CHILDREN, YOUTH AND FAMILIES, | |
|         Respondent. | |

COBURN, J. — Jesus Diaz[1] appeals the termination of his parental rights to his daughter, V.D.-F., and his son, M.D. He argues that he was denied due process when the trial court terminated his rights based on parental deficiencies of which he had no notice. In the alternative, he contends the Department of Children, Youth and Families failed to establish that it provided services to help him correct these deficiencies. Because we conclude that Diaz had sufficient notice of the issues to be raised at the termination trial, and the Department

---

[1] We refer to Diaz using the name he used for himself when testifying. Citations and pin cites are based on the Westlaw online version of the cited material.

offered all services that were appropriate and reasonably available, we affirm the order of termination.

FACTS

The facts giving rise to the dependency and termination proceedings in this case are largely uncontested. Diaz is the father of V.D.-F. (born in November 2011) and M.D. (born in March 2008).[2] Diaz has history of struggles with his mental health. He has been diagnosed with schizophrenia and schizoaffective disorder, which have caused him to experience hallucinations, delusions, and erratic behavior.

The Department filed its first dependency petition as to the children in 2012 after Diaz experienced a significant mental health crisis and was involuntarily committed due to concerns that he posed a danger to himself or others. Diaz signed an order establishing that the children were dependent. As part of the dependency proceedings, he was required to participate in a psychological evaluation and individual mental health counseling as well as several different services related to parenting skills. Diaz's evaluation emphasized the importance of "the father maintaining his medication regimen in order to prevent future psychotic episodes."

Diaz's mental health stabilized, and the juvenile court returned the children to his care in January 2015. However, the juvenile court warned Diaz that he

---

[2] The mother's parental rights were terminated by default in January 2019, and she did not appeal.

could not allow any contact between the children and their mother who had significant untreated substance abuse issues.

The Department filed a motion to remove the children in May 2015 after M.D. admitted at school that he was seeing his mother and that he "was not supposed to tell the social worker or the CASA." The juvenile court removed the children.

The court returned the children to Diaz in November 2015, and the dependency case was dismissed in June 2016. Shortly thereafter, Diaz stopped taking his prescribed medication. In January 2017, he was arrested for assaulting his uncle. In February 2017, both he and the mother were arrested after Diaz used a piece of construction equipment to damage a hotel room and threaten police officers.

The Department filed a second dependency petition. Diaz again signed an agreed order of dependency. He also agreed to participate in individual mental health counseling, medication management, a parenting education program, and a parenting assessment focusing on his psychiatric needs.

Dr. Claudette Antuña conducted the parenting assessment in May 2018. According to Dr. Antuña, the father's testing results indicated that he "overvalues discipline & loyalty," "has rigid expectations of children," and "is impetuous and easily angered." Dr. Antuña was concerned that the father "did not show a strong awareness of the impact his behavior has on others."

As part of her assessment, Dr. Antuña observed a visit between Diaz and the children. During the visit, V.D.-F. told Diaz that she enjoyed the visit and

3

wanted to visit with him regularly but did not want to live with him. M.D. nodded in agreement.

Dr. Antuña concluded that Diaz was not currently able to parent the children. Because Diaz had a history of stopping his medication, Dr. Antuña believed that his medication compliance should be assessed for at least three years before the children could be returned to him.

In August 2018, therapist Geoffrey Thomas began seeing both children for individual counseling for post-traumatic stress disorder. Thomas also saw the children together with their foster parents for family counseling. According to Thomas, the purpose of the individual counseling was to help the children explore their past trauma, which both children described as "neglect, a lot of instability in terms of living situation, like moving and being homeless" and "witnessing domestic violence, drug use, and…physical abuse." The purpose of the family counseling was to help the foster parents "develop skills to help the kids cope with trauma, past trauma, and help them develop skills to deal with behavioral issues, and supporting, like, relationship communication, relationship building."

In the fall of 2018, V.D.-F. disclosed to Thomas that Diaz had sexually abused her while she was living with him. She also disclosed sexual abuse by two older male cousins during the same time period. V.D.-F. said Diaz "told her never to tell and that no one would believe her if she told." According to Thomas, V.D.-F. was "[c]rying, shaking, stuttering, [and] physically retreating" when discussing the sexual abuse. V.D.-F. also reported the sexual abuse to the

4

Department social worker, Megan Meyer; the court-appointed special advocate (CASA), Elizabeth Cohen; her foster parents, a Child Protective Services (CPS) investigator, a police officer, and staff at Harborview Medical Center. The content of her reports was consistent.

Claudia Kirkland, a clinical social worker specializing in trauma treatment, began providing additional therapy to V.D.-F. to address her trauma symptoms including nightmares, difficulty sleeping, and a decreased interest in doing things. Kirkland concluded that "it would be detrimental to [V.D.-F.]'s ongoing trauma therapy to resume visitation with her father."

The Department moved to suspend Diaz's visitation with the children. The juvenile court discontinued Diaz's contact with V.D.-F. but permitted supervised visitation with M.D. to continue. The juvenile court also ordered Diaz to participate in a sexual deviancy evaluation.

Matthew Platte conducted the father's sexual deviancy evaluation. According to Platte, testing showed the father had "low cognition scores, a low level of insight, and significantly elevated scores indicating the need to be perceived in a favorable light." Platte did not recommend the father participate in any sexual deviancy treatment. He stated, "Being a – the fact that his – his – he's already in mental health counseling, he's already got a medication regime, he's in -- he's categorically denying the offense, so being able to process, you know, offense history or sexual urges, he would just maintain that denial through counseling, so I think it would be ineffective, and there'd be very few treatment objectives we'd be able to address."

As part of the evaluation, Diaz underwent a polygraph examination by Robert Littlejohn. During the polygraph, Diaz denied sexually abusing V.D.-F. But told Littlejohn that he had a "mental episode" during the timeframe that the sexual abuse allegedly occurred. Diaz also told Littlejohn that he did not like taking psychiatric medication and was not taking his prescription at the time of the polygraph. According to Littlejohn, Diaz gave "extremely inconsistent responses throughout the testing process." Littlejohn stated this was "very unusual" and was "one of the rare times that I've had this erratic of a response." As a result, the polygraph results were deemed "inconclusive."

On November 18, 2018, the Department filed a petition to terminate Diaz's parental rights. The petition alleged three primary grounds for termination. First, the petition alleged that Diaz had "significant mental health issues." It stated that "[w]hen he is on medication he is stable, but if he discontinues his medication he rapidly deteriorates with significant hallucinations and becomes violent and dangerous." Second, the petition alleged that Diaz had "allowed for the mother to be around the children and care for them despite court orders prohibiting that contact" and "is unwilling to divorce the mother for the purposes of establishing a parenting plan if the children were to return to his care." Third, the petition alleged that the children had experienced "significant trauma" and abuse with Diaz and that they did not want to live with him.

On June 25, 2019, the Department held a shared planning meeting to discuss, under what circumstances if any, Diaz could begin having contact with V.D.-F. again. Both Thomas and Kirkland attended the meeting. At the meeting,

Diaz was "unwilling or unable to listen to and/or understand [V.D.-F.]'s reported concerns." He accused V.D.-F. of lying about the sexual abuse and stated that "he believed her reports came from an adult and that a child would not be able to come up with the things that she reported." He also "refused to consider the trauma that [V.D.-F.] has reported experiencing" and "refused to consider the recommendations from her therapists." Diaz insisted that both children would be "fine and happy" once they were returned to him.

Trial on the termination petition was originally scheduled to take place on August 12, 2019. On the morning of trial, Diaz discharged his attorney. The trial court continued the trial date for several months in order for Diaz to obtain new counsel.

On September 19, 2019, the Department filed an amended termination petition incorporating additional facts regarding V.D.-F.'s sexual abuse disclosures. The petition now alleged, as a fourth ground for termination, that Diaz was unable to meet V.D.-F.'s mental health needs.

> Mr. Diaz appeared unwilling or unable to listen to and/or understand [V.D.-F.]'s reported concerns, or the therapeutic recommendations that visits not resume. Mr. Diaz repeatedly interrupted others, stating that he believes [V.D.-F.] was coached into making her statements, and that people are lying. It appeared to the Department that if Mr. Diaz did start to have contact with [V.D.-F.], he would not be capable of renewing their contact in a sensitive way that put [V.D.-F.]'s feelings first, or even of acknowledging her feelings.

Trial on the petition took place in January and February of 2020. At the time of the trial, V.D.-F. and M.D. were 8 years and 11 years old respectively.

7

Over the course of nine days, the trial court heard testimony from 17 witnesses and reviewed 102 exhibits.

The evidence showed that Diaz was taking his medication and understood the importance of taking it as prescribed. But the evidence also showed that Diaz continued to have limited insight into the children's mental health needs. At trial, Diaz continued to reiterate that V.D.-F. was lying about the allegations of sexual abuse. He also continued to claim that children wanted to live with him but that the foster parents and social workers had coached the children to say otherwise.

Cohen testified that every time she met with the children, they immediately said, "I don't want to go back. I don't want to go back." According to Cohen, "[t]hey said it to me every visit, before I even asked, you know, as an initial greeting. It was almost their greeting to me when I would come for a monthly visit." Both children told Cohen they were scared of Diaz and "didn't feel safe" with him. The children also sent letters to the court stating that they wanted to stay with their foster parents. M.D.'s letter stated: "My biological dad is trying his best to get me back, but I do not want to go back with him…If I lived with my dad…anything could happen and I could get hurt and I do not want to get hurt, badly."

In its ruling, the trial court addressed the three grounds for termination argued by the Department: Diaz's mental health history, his continued relationship with the mother, and his limited insight into the children's needs.  As to Diaz's mental health, the trial court concluded that while his mental health issues were significant, the risk of decompensation did not render him unfit to

8

parent. But the trial court concluded that the two other grounds constituted a basis for termination. As to Diaz's relationship with the mother, the trial court found as follows:

> However, the father's continuing relationship with the children's mother does present a risk to the children if the children were returned to the father's care. Her parental deficiencies are unremedied and uncontested. The mother's parental rights have been terminated; she did not participate in any remedial services in the children's current dependency action, and has not visited he children since December of 2017. There are no services available to cause the father to separate from the mother; despite this being an ongoing issue in both dependency actions. The termination petition in this matter was filed November 8, 2018, but Mr. Diaz did not separate from the mother until the month prior to this trial. She is still on his lease.

As to Diaz's understanding of M.D. and V.D.-F.'s unique needs, the trial court found:

> In addition to the above, the children experienced significant trauma when they were in the father's care, as a result of which they are diagnosed and receiving care for Post-Traumatic Stress Disorder. [V.D.-F.] is also in counseling for sexual trauma. The father's limited insight into his children's needs is a compelling basis to find that he is unfit to parent them now, and will not be fit to do so within the children's near future. The court does not reach whether the sexual abuse occurred, but [V.D.-F.] is highly traumatized by her perception of these experiences. Attempts by the Department to discuss the children's needs have been met by hostility [from] the father, who has been angry and defensive in meetings and who did not respond to the efforts of social worker Mariani to contact him to discuss those needs. As observed by Dr. Antuna, the father has rigid expectations of children, shows paranoia and lack of insight, and has difficulty with identifying problems and with problem-solving. Those attributes were demonstrated in the father's testimony before the court. The father testified that many of the allegations before the [c]ourt were the result of a conspiracy between the foster parents, the social workers, and the therapists. The father is not able to understand, or to plan for how to meet, these children's complex emotional and developmental needs.

9

The trial court rejected the father's claim that he had not received the necessary services to learn about his children's needs.

> At trial the father argued that necessary services had not been provided, in the form of family therapy or of meeting with the children's therapists to learn about their needs. Prior to trial the father had not requested either of these. Family therapy with the children, or attending the children's therapy sessions, while they continued to oppose reunification, would not have been healthy for the children. The Department had discussed the father meeting with the children's therapists, however given the father's lack of curiosity about and lack of insight into the children's emotional needs, to the extent that this was a service that was necessary and reasonably available, providing that service would have been futile and would not have been capable of correcting the father's deficiencies within the near future. The Department attempted to discuss the children's needs during phone conversations and meetings, and sent the father the children's mental health assessments translated into Spanish. The Department did not support sending the father to the children's therapy sessions, due to his expressed disbelief (to the Department and at trial) that the children had emotional issues related to the care that he had provided for them, because his participation could have a negative impact on the children's progress. The father testified that he believed that the social workers, CASA and therapists were making up mental health issues for the children as a way of preventing their return to his care. The father had attended multiple services in the first and second dependencies, including parent coaching, that emphasized the importance of recognizing and learning about his children's needs so that he would be able to meet those needs. The father also did not discuss the children's needs or diagnoses with his own therapist during the three years of his own therapy.

The trial court entered findings of fact and conclusions of law terminating the father's parental rights. Diaz appeals.

ANALYSIS

1.  <u>Standard of Review</u>

Parents enjoy fundamental liberty interests in the continued care, custody, and companionship of their children. <u>Santosky v. Kramer</u>, 455 U.S. 745, 753, 102

10

S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Termination of the parent-child relationship involves a two-step process. In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). First, the Department must prove the six termination factors set forth in RCW 13.34.180(1) by clear, cogent, and convincing evidence. A.B., 168 Wn.2d at 911. One of these factors is whether the Department has provided all the services ordered as part of the dependency proceedings, as well as "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future."[3] RCW 13.34.180(1)(d). If this burden is satisfied, the court must also find by a preponderance of the evidence that termination is in the best interests of the child. RCW 13.34.190; In re Dependency of K.N.J., 171 Wn.2d 568, 576-77, 257 P.3d 522 (2011).

Where, as here, the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the court's findings of fact and whether those findings support the court's conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). Unchallenged findings of fact are verities on appeal. In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015). Challenged findings will be upheld "[i]f there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown to be "'highly probable.'" In re Dependency of

---

[3] A condition that prevents reunification constitutes a parental deficiency. In re Welfare of C.S., 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010).

T.L.G., 126 Wn. App. 181, 197, 108 P.3d 156 (2005) (quoting In re Dependency of H.W., 92 Wn. App. 420, 425, 961 P.2d 963, 969 P.2d 1082 (1998)). We defer to the trier of fact on issues of conflicting testimony, credibility of the witnesses, and the weight or persuasiveness of the evidence. In re Welfare of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011). Such deference is particularly important in proceedings affecting the parent and child relationship because of "the trial judge's advantage in having the witnesses before him or her." A.W., 182 Wn.2d at 711.

2.     Notice

Diaz contends that his right to due process was violated because he was not given notice that his relationship with the mother or his inability to understand the children's needs would be grounds for termination. We conclude that Diaz received adequate notice that the trial court would consider these factors as parental deficiencies.[4]

A parent's right to the "custody, care, and companionship" of their children cannot be abridged without due process of law. In re Welfare of Key, 119 Wn.2d 600, 609, 836 P.2d 200 (1992). Due process is a flexible concept that may vary with the interests that are at stake, but at its heart are the concepts of notice and the ability to be heard. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313-314, 70 S. Ct. 652, 94 L. Ed. 865 (1950).

---

[4] As an initial matter, the Department argues that we should decline to consider Diaz's due process argument because it was raised for the first time on appeal. But, as this court has previously held, this argument is reviewable under RAP 2.5(a)(3) as an issue of constitutional magnitude. In re Dependency of A.M.M., 182 Wn. App. 776, 790 n.8, 332 P.3d 500 (2014).

In the context of a termination proceeding, due process requires that parents have "notice of the specific issues to be considered" in order "to prevent surprise, helplessness and disadvantage." In re Dependency of A.M.M., 182 Wn. App. 776, 791, 332 P.3d 500 (2014) (quoting In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P.2d 134 (1970)). Both sides "need to know what deficiencies are at issue since the State has to prove the deficiencies to make its case while the parent has to know what allegations to defend against." Matter of Welfare of F.M.O., 194 Wn. App. 226, 232, 374 P.3d 273, 277 (2016). Due process is violated if a parent is held accountable for a parenting deficiency about which he or she was never notified. A.M.M., 182 Wn. App. at 790. We review de novo an alleged deprivation of due process. In re Welfare of A.G., 160 Wn. App. 841, 844, 248 P.3d 611 (2011).

Here, there was ample evidence to show that Diaz had notice that his failure to understand the children's needs was a barrier to reunification. First, the Department's original trial brief – filed more than five months prior to the trial – noted concerns about Diaz's ability to understand his children's needs particularly those of V.D.-F. surrounding her allegations of sexual abuse. It alleged that Diaz had been "unwilling or unable to listen to and/or understand [V.D.-F.]'s reported concerns, or the therapeutic recommendations that visits not resume." It also alleged that if Diaz did start to have contact with V.D.-F., "he would not be capable of renewing their contact in a sensitive way that put [V.D.-F.]'s feelings first, or even of acknowledging her feelings." The trial brief asserted, as a basis for termination, that "[t[he father has demonstrated that she [sic] is

13

currently incapable of prioritizing or providing for the children's emotional, physical, mental and developmental needs, and that there is little likelihood that he can remedy his parental unfitness within the children's near future." Second, the Department's amended termination petition – filed four months prior to the trial – alleged that the parents were "incapable of providing for the children's emotional, physical, mental and developmental needs." It also alleged concerns that Diaz was unable to meet V.D.-F.'s mental health needs.

> Mr. Diaz appeared unwilling or unable to listen to and/or understand [V.D.-F.]'s reported concerns. He refused to consider the trauma that [V.D.-F.] has reported experiencing, and he refused to consider the recommendations from her therapists. Mr. Diaz repeatedly interrupted others, stating that he believes [V.D.-F.] was coached into making her statements, and that people are lying. It was very clear from that meeting that if Mr. Diaz did start to have contact with [V.D.-F.], he would not be capable of renewing their contact in a sensitive way that put [V.D.-F.]'s feelings first, or even of acknowledging her feelings.

Finally, Meyer sent Diaz a letter on October 24, 2019, outlining the Department's concerns for the children's safety in his care and stating what he needed to do in order to reunify with the children. The letter specifically identified Diaz's lack of awareness of his children's needs as a deficiency.

> Another concern to the Department is your lack of understanding regarding your children's special needs, particularly in terms of both children's trauma histories and how their trauma experiences continue to affect them, particularly for [V.D.-F.]. Also, [M.D.]'s special education needs. [M.D.] continues to be behind in school and he requires consistent and dedicated assistance from adults to assist him in being successful academically. The Department has tried to provide you with opportunities to learn about what the children's needs related to their trauma in Shared Planning Meetings, however, it did not appear that you were willing to listen or accept the therapist's assessments.  If you are willing to learn more about their trauma history, how it impacts them, and what

their needs are to address their traumas, please contact your social worker about this so we can discuss further.

> If you fail to correct the identified parental deficiencies, this may result in the termination of your parental rights.

(Emphasis added). Meyer sent the letter to Diaz in both English and Spanish. We conclude that Diaz had ample notice that his lack of insight would be considered at the termination trial.

Similarly, Diaz fails to establish he lacked notice that his continued relationship with the mother constituted a parental deficiency. This relationship had been a barrier to reunification since the first dependency proceeding. When the children were returned to Diaz in January 2015, the juvenile court explicitly forbade any contact between the mother and children other than what was supervised by the Department. A few months later, when the Department became aware that Diaz had allowed such contact, the Department sought to remove the children. In response, Diaz filed a declaration acknowledging that he knew he had violated the court order and asking the court to "please not punish my children for my poor judgment." The trial court removed the children "based on [the father's] failure to follow the agreed conditions of placement." Gradually, the trial court expanded the father's visitation with the children stressing that "[t]he father shall not allow any contact with the mother during any of the agreed visits with the children." The trial court ordered that the children could not be returned until the father was "able to articulate…the potential risks posed by the mother to the children by her use of substances."

Moreover, both the original and the amended termination petition alleged Diaz's continued relationship with the mother as a basis for termination stating, "[t]he father has also allowed for the mother to be around the children and care for them despite court orders prohibiting that contact" and "[t]he father is unwilling to divorce the mother for the purposes of establishing a parenting plan if the children were to return to his care."

Finally, Meyer expressed concern about Diaz's continued relationship with the mother in her October 24, 2019 letter:

> Please note: the Department also has significant concern about your ongoing relationship with the children's mother, Ms. Franklin, due to the ongoing risk of harm to the children by Ms. Franklin and your failure to protect them from this. Ms. Franklin has never addressed her parenting deficiencies or safety concerns. The Department has ongoing concern about your willingness and ability to be protective of the children from Ms. Franklin, as demonstrated by a pattern of behavior in the past where you have allowed Ms. Franklin to see the children on multiple occasions despite specific court orders prohibiting contact.

Diaz analogizes this case to Dependency of A.M.M. In A.M.M., the Department asserted at the termination trial that the mother was unfit to parent because "she lacked understanding of her children's developmental needs." A.M.M., 182 Wn. App. at 784. The trial court agreed and terminated the mother's parental rights based on three issues one of which was the mother's "lack of knowledge regarding her children's development needs." A.M.M., 182 Wn. App. at 792. This court reversed holding that the mother's due process rights were violated because "[n]either the termination petition nor the dependency petition stated that [the mother's] lack of knowledge regarding her children's

16

developmental needs constituted a parental deficiency" and "there is no evidence in the record that [the mother] was ever informed that she could lose her parental rights if she did not adequately familiarize herself with her children's developmental needs." A.M.M., 182 Wn. App. at 792.

But here, unlike in A.M.M., Diaz had ample notice of the parental deficiencies at issue at the termination trial. He was not surprised or disadvantaged when the Department argued that they constituted parental deficiencies. In fact, Diaz denied that they were parental deficiencies contending that the children did not have any special mental health needs and he had separated from the mother shortly before the trial. The holding in A.M.M. does not compel reversal here.

3.      Failure to Provide Services

In a related argument, Diaz contends the Department failed to meet its burden under RCW 13.34.180(1)(d) because it did not provide him with services to help him gain insight into the children's needs.

When a condition precludes reunification, the Department must provide any necessary services to address that condition In re Matter of K.M.M., 186 Wn.2d 466, 480, 379 P.3d 75 (2016). The services offered must be specifically tailored to the parent's unique needs. In re Dependency of T.R., 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). However, where the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services. K.M.M., 186 Wn.2d at 483. The provision of services is futile where a parent is unwilling or unable to participate

17

in a reasonably available service that has been offered or provided. K.M.M., 186 Wn.2d at 483 (citing In re Dependency of Ramquist, 52 Wn. App. 854, 861, 765 P.2d 30 (1988)).

Here, the Department offered Diaz a variety of services designed to address his overall parenting abilities. Diaz does not dispute that during the first dependency proceeding the Department offered him a parenting skills class, called Incredible Years, as well as parent-child interactive therapy. See In re Welfare of Angelo H., 124 Wn. App. 578, 587, 102 P.3d 822 (2004) (services offered in prior dependencies may properly be considered as factual evidence in a termination of parental rights proceeding). The Incredible Years program teaches parents "how to relate to their children on their developmental level." Parent-child interactive therapy instructs parents on "bonding relational experiences" and how to relate to their children's needs based on the child's "age and developmental needs." Department social worker Colleen Mariani testified that "the basis behind" these services is "that it is important to understand your child's needs."

During the second dependency proceeding, the Department referred Diaz to a parenting education program called Parent Effectiveness Training. This program had a Spanish-speaking provider and worked with Diaz "on understanding children's cues, general parenting skills, and education

surrounding things like discipline."[5] After completing the program, Diaz was referred for additional parenting skills training at El Centro de la Raza.

In addition, the Department social workers worked with Diaz to increase his understanding of V.D.-F.'s and M.D.'s unique needs. Meyer testified that she had discussed with Diaz, on more than one occasion, the importance of understanding the children's trauma and resulting mental health issues. She shared the results of the children's mental health assessments with Diaz and met with him regularly "to make sure he's aware of their needs and their experiences, like how it plays out in their day to day behaviors, their sleep, things like that." She also suggested that Diaz contact the children's therapists to inquire about becoming involved in their therapy.

But despite these services, Diaz did not demonstrate any increased insight into his children's mental health needs or any willingness to develop it. When Meyer invited the children's therapists to meetings, Diaz refused "to accept how the children's trauma continues to affect them" and was "not willing to hear the therapist's discussions about their therapy together, what they're working on, their diagnoses, things like that." Even at trial, Diaz testified that he believed the children's therapists were wrong and had merely fabricated diagnoses for the children. He demonstrated no desire to consult with the children's therapists

---

[5] Diaz argues that the Department's offer of Parent Effectiveness Training was insufficient because it "has nothing to do with trauma education." In doing so, he relies on information obtained from what appears to be the training program's official website. Because this information is not part of the record on appeal, we decline to consider it. We also decline Diaz's request that we take judicial notice of the website pursuant to ER 201.

stating, "I feel that they're working against me." Diaz also minimized the children's desire not to live with him. He stated that he did not believe they were telling the truth and speculated that they had been forced to write the letters.

Diaz argues that the Department should nonetheless have offered him more ways to participate in the children's therapy. But the trial court found that such a service would not have been appropriate in this case.

> Family therapy with the children, or attending the children's therapy sessions, while they continued to oppose reunification, would not have been healthy for the children. The Department had discussed the father meeting with the children's therapist, however given the father's lack of curiosity about and lack of insight into the children's emotional needs, to the extent that this was a service that was necessary and reasonably available, providing that services would have been futile and would not have been capable of correcting the father's deficiencies within the near future.

While Diaz assigns error to this finding as a whole, he does not challenge the factual basis behind the court's finding that family therapy was not in the children's best interest. The trial court's finding was supported by substantial evidence. Kirkland testified that it is common for caregivers to be involved in a child's trauma therapy but that it was unlikely that she would involve the alleged perpetrator of abuse in a child's therapy "if the perpetrator had not done any treatment and shown any accountability." Thomas testified that allowing Diaz to participate in the children's therapy would have a "negative effect" on the children because Diaz and the children had "competing goals." And Meyer testified that family therapy would only be productive "[i]f the children, particularly [V.D.-F.], was at a point where she was not fearful of Mr. Diaz." Because Diaz did not demonstrate any interest in participating in the children's therapy, and because

20

his participation would have been harmful to the children, such a service was futile.[6] See, e.g., K.M.M., 186 Wn.2d at 480-83 (attachment and bonding service would have been futile where child "could not tolerate interactions with her father," "refused to attend visitation," and "would not be a willing participant in any therapeutic services with her father").

For the first time on appeal, Diaz asserts that the Department should have directed his own mental health counselor to offer "trauma-informed" counseling in order to help him understand what the children had experienced. But there was no evidence in the record that his counselor was willing or able to offer such a service. Nor was there any evidence, other than Diaz's speculation, that such a service would have been necessary or appropriate. The record is insufficient to permit meaningful review of this claim.

Finally, Diaz assigns error to the trial court's findings that "[c]ontinuation of the parent-child relationship clearly diminishes the children's prospects for early integration into a stable and permanent home," and that "[t]ermination of parental rights is in the best interest of these young children." But we do not reach these assignments of error because Diaz fails to support them with any argument or

---

[6] Diaz contends that this court should, at the very least, reverse the termination order as to M.D. claiming that "[h]is issues were less complex and there was no obstacle or reason why he could not have engaged in family counseling" with Diaz. But, as discussed above, the trial court found that family therapy would not have been appropriate for either child "while they continued to oppose reunification." Because the evidence established that the Department offered all necessary and appropriate services with regard to both children, Diaz's argument is without merit.

authority in his brief. <u>See</u> RAP 10.3(a)(6); <u>Cowiche Canyon Conservancy v. Bosley</u>, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Affirmed.

_Cohen, J._

WE CONCUR:

_Mann, C.J._        _Dwyer, J._